# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8404 | **DATE** | February 13, 2003 |
| **CASE TITLE** | *Shirley A. Riley vs. UOP LLC* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court denies as moot plaintiff's motion *in limine* [24-1]; denies defendant's motion in limine [27-1]; denies as moot defendant's motions *in limine* [25-1, 26-1, 28-1]; and grants defendant's motion for summary judgment [21-1]. Final judgment in this case is entered in favor of defendant UOP LLC and against plaintiff Shirley A. Riley. No motions for reconsideration will be entertained.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | FEB 1 4 2003 | | |
| | Notified counsel by telephone. | | date docketed | | 45 |
| ✓ | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | | date mailed notice | | |
| CW | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **SHIRLEY RILEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No: 01 C 8404** |
| | ) | |
| **UOP LLC,** | ) | **Judge James H. Alesia** |
| | ) | |
| Defendant. | ) | |

DOCKETED

FEB 1 4 2003

## MEMORANDUM OPINION AND ORDER

Before the court are (1) plaintiff's motion *in limine*; (2) defendant's motions *in limine*; and (3) defendant's motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court (1) denies as moot plaintiff's motion *in limine*; (2) denies defendant's motions *in limine*; and (3) grants defendant's motion for summary judgment.

## I. BACKGROUND[1]

Plaintiff Shirley Riley ("Riley") brings this suit, claiming that defendant UOP LLC ("UOP") discriminated against her on the basis of her race, sex, and age. In order to understand the court's opinion, one must be aware of a number of facts. For the sake of clarity, a recitation of these facts is in six parts. Part A describes Riley's hiring at UOP and her supervisory structure. Part B outlines Riley's training. Part C discusses Riley's performance evaluations. Part D describes Riley's disciplinary history. Part E explains UOP's decision to reduce its workforce and Riley's termination. Part F outlines the current lawsuit.

---

[1] Unless otherwise indicated, the following facts – taken from the parties' Local Rule 56.1 statements – are undisputed.

## A.    Riley's Hiring and her Supervisory Structure

Riley is an African-American female and was born on April 27, 1948.  She began working at UOP – a refining, petrochemical, and technology company – as an Operator Trainee at UOP's manufacturing facility in McCook, Illinois (the "McCook facility") on November 3, 1998.  During the time Riley was employed by UOP, the McCook facility consisted of several major manufacturing processing lines ("plants") and a few minor plants.  As a newly-hired Operator Trainee, she was assigned to Plant 26 to begin her training, which was frequently used for operator training because it was the easiest of the plants to learn.

During the period of time at issue in this case, Aaron Beck ("Beck") was Operations Manager for the McCook facility.  Terrance Brodin ("Brodin") was an Area Coach at UOP and his duties included training plant operators, as well as other tasks.  Otis Dixon ("Dixon") was a Shift Supervisor.  A Shift Supervisor's duties included ensuring that all operations at the facility ran smoothly and making sure that the operators working on the plant were performing acceptably and were properly trained.  Steve Armstrong ("Armstrong") and Rod Ives ("Ives") were Shift Breaker Operators, whose duties included the initial training of new Operator Trainees.  While she was working at UOP, Riley reported directly to Dixon, as well as other supervisors, depending on her shift.  Dixon and Brodin reported directly to Beck.

## B.    Riley's Training

Newly-hired Operator Trainees usually spend two to four weeks in "hands on" training with a Shift Breaker Operator.  Armstrong had primary responsibility for Riley's "hands on" training when she was first hired.  He trained Riley for at least two weeks.  According to

2

Armstrong, Riley had trouble understanding and remembering some tasks that he showed her. Two or three days after Riley started, Armstrong met with Brodin to share his disappointment in her progress. Subsequently, Armstrong sent an email to Beck in which he described some of Riley's and another operator's problems with understanding the plant. Brodin asked Ives to give Riley additional training. When Beck asked Ives how Riley was doing, Ives replied that Riley was "having a hard time grasping how to make adjustments on [the belt]." (Ives Dep. at 26.) Additionally, Ives informed Beck via email of Riley's problems understanding her training.

After the initial training period, the training of an Operator Trainee is conducted primarily by a Shift Supervisor. Dixon also noted that Riley had trouble with the Plant 26 belt. Additionally, Brodin, at times, trained the plant operators, including Riley, on specific tasks. Particularly, he trained Riley on the alignment of the Plant 26 belt. Brodin told Beck that Riley's technical skills were questionable, and Brodin based his conclusion upon the fact that she continued to have problems with routine tasks that should not have been problems for operators who had worked at UOP as long as she had.

## C.   Riley's Performance Evaluations

Newly hired Operator Trainees are considered to be "in grade progression" ("IGP") and receive written performance evaluations every six months for two years. A standard UOP form was used for the IGP written performance evaluations. The operator trainee received a grade in each of thirteen categories as well as an overall grade. The assignment of an overall performance rating was subjective, and the supervisor had discretion to give weight to each category.

Beck participated in his employees' performance reviews. He would seek early feedback on the performance of Operator Trainees by asking Shift Breaker Operators and Shift Supervisors about the trainee's progress. Beck received input for Riley's performance evaluations from Armstrong, Ives, Brodin, and Dixon, and also referred to other performance evaluations and disciplinary write-ups.

Riley's first IGP written performance evaluation was dated May 3, 1999. On that evaluation, Dixon gave Riley an overall rating of "M+," which meant that she was "meeting most expectations, plus." (Beck Dep. Ex. 47.) On that evaluation, Dixon wrote that Riley needed to ask more questions when she didn't understand the plant or experienced other problems. He also noted that she "was a little weak on the total operations" of the belt that carried product through the plant. (*Id.*) Beck did not participate in Riley's first performance evaluation.

Riley's second IGP written evaluation was dated October 22, 1999. Dixon initially prepared the October 22 evaluation. He gave Riley a score of "M-" in three of the thirteen performance categories. Beck reviewed the evaluation and questioned Dixon giving Riley a score of "M" in five other performance categories, because those scores conflicted with feedback that he had received from other supervisors. After hearing Beck's reaction to the evaluation, Dixon lowered Riley's score for productivity from an "M+" to an "M," and her score for team work from an "C" or "M+" to an "M." Also, Dixon changed Riley's overall score to an "M-."

Riley's third IGP written evaluation was dated April 21, 2000. Dixon gave her an overall score of "M-." Dixon based that score on his personal observation of Riley's work, as well as

input from other Operators and emails from Brodin. After Dixon drafted the evaluation, he submitted it to Beck, who signed it and did not dispute any of the scores that Dixon had given Riley.

In conjunction with the April 21, 2000 evaluation, and because Riley had earned a score of "M-," Dixon – at Beck's request – drafted a document entitled "UOP and My Expectations for the Next Six Months." (the "May Personal Improvement Plan") (Beck Dep. Ex. 50-51.) This document listed a series of goals that Dixon had for Riley. Dixon expected that someone with Riley's training and tenure at UOP should not have been having the types of problems that were listed on the May Personal Improvement Plan. When Dixon spoke with Riley about the written evaluation and May Personal Improvement Plan, he informed her that her performance needed to improve because she had been with UOP for a year and a half. Dixon submitted a copy of the May Personal Improvement Plan to Beck, but did not discuss it with him. Dixon placed Riley on a second Personal Improvement Plan for the period from May 3, 2000 through November 3, 2000. He gave her a score of "M," overall, on the two personal improvement plans, indicating that she was meeting most expectations with regard to Dixon's goals for her. However, at the time Dixon reviewed the second Personal Improvement Plan, in November 2000, it was his opinion that, although Riley had improved, she "still had a ways to go." (Dixon Dep. at 150.)

Dixon prepared Riley's fourth IGP written evaluation in November 2000. On November 13, he and Brodin exchanged email regarding Dixon's proposed scores for Riley. Dixon adopted Brodin's suggestion that Riley receive an "M," rather than an "M+" in the categories of "Technical Skills" and "Planning and Organizing." Riley was terminated before this evaluation became final.

5

**D.     Riley's Disciplinary Record**

According to UOP's Corrective Action Policy, "progressive corrective action may include such steps as 1) verbal warnings, 2) written warnings, 3) time off." (Beck Dep. Ex. 67.) Under the policy, there are supposed to be verbal warnings before a written warning is given, but in a case of a major infraction of safety, a written warning can be imposed without any prior verbal warning.

On August 11, 1999, Brodin issued Riley a written warning for violating a UOP safety policy. Riley had failed to complete all of the required information on a Line Breaking Permit. The permits indicate the status of a piece of broken equipment to an employee making repairs on the equipment. When Brodin discussed the Line Breaking Permit with Riley, he thought she seemed confused about what she had done wrong and did not understand that she was supposed to have filled out all the information.[2]

On February 17, 2000, Dixon issued Riley a written warning for running a piece of equipment outside of its stated limits. Dixon drafted the warning and submitted it to Beck for his approval. However, Dixon did not check the proper box to indicate that it was a final warning for Riley. Thus, Beck wrote "final warning" on the warning document to indicate to Riley that her next written warning would result in a suspension.

---

[2]Riley argues that UOP policy required her first disciplinary action to be a verbal warning, as opposed to a written warning. She contends that her written warning for the Line Breaking Permit violation was discriminating. However, the UOP policy says that a written warning can be imposed without any prior verbal warning in cases of major infractions of safety. Riley provides no evidence that she was treated any differently than any other UOP employee who committed a similar violation. Therefore the court is unpersuaded by Riley's argument.

On February 23, 2000, Riley was suspended for violating UOP safety rules. The documentation of her suspension stated that she had violated a safety practice by climbing onto the platform without the guard rail in place.[3] Riley took responsibility for the incident.

## E. Riley's Termination

Early in 2000, employees at the McCook facility were concerned about future layoffs. UOP's senior supervisors met with Beck in order to discuss the possibility of a future reduction in force ("RIF"). At that meeting, Riley, Roy Willis ("Willis"), Vince Hristinski ("Hristinski"), Brian Gardner ("Gardner"), and Ellis Funchess ("Funchess") were named as people who were not "keepers," if a RIF occurred. (Brodin Dep. at 22.) During the summer of 2000, Beck asked Brodin who should be eliminated in a RIF and Brodin replied, "probably [Riley] would be at the head of the list." (Brodin Dep. at 26.) He told Beck that he was disappointed in Riley's progress, given her time at UOP.

Later in 2000, UOP decided to reduce its workforce, including workers at the McCook facility. Part of this RIF was to eliminate authorizations to hire for vacant positions. However, the reduction also included the termination of some active employees. In October 2000, Vice President of Manufacturing Allen Arneson ("Arneson"), to whom Beck reported directly,

---

[3] Riley contends that UOP's "Elevated Work" policy does not apply to this incident and appears to be arguing that her punishment was, therefore, discriminatory. However, the documentation does not mention that policy and Beck testified that Riley was not being disciplined for a violation of the Elevated Work policy and that she was punished for using a device without using the safety equipment. Also, Riley argues that the fact that Beck personally observed this violation of UOP's safety rules demonstrates Beck's discrimination against her. However, Riley offers no evidence or authority to support her speculation.

directed Beck to identify three employees to be included in the workforce reduction. Arneson told Beck to base his recommendations upon employee performance.

Soon after receiving Arneson's telephone call, Beck identified Riley, Dixon, and Hristinski as his three worst performers. He also considered Willis a poor performer, but did not think that he should be included in the RIF because he had a clean disciplinary record. Beck reached his decision based upon his overall familiarity with employee performance and disciplinary records. He did not review any documents except possibly for a worksheet of employee ratings that he maintained. Beck testified that he had not seen the November 2000 IGP written evaluation that Dixon had prepared for Riley or either of Dixon's two personal improvement plans for Riley.

Subsequently, Jerome Caufield ("Caufield"), another employee, engaged in conduct that warranted his termination. Beck decided to include Caufield in the RIF, instead of one of the employees whom he had already selected. Beck decided to replace Hristinski and not Riley with Caufield even though Hristinski and Riley each had received "M-" ratings on their most recent performance evaluations. Beck made this decision because it was his recollection that Hristinski had higher performance ratings and a cleaner discipline record over the past two or three years. Arneson approved Beck's recommendations for employees to be terminated.

On December 5, 2000, Beck met with Riley to inform her that she was being terminated. He explained that she was being terminated as part of the RIF and due to her performance. No other Operator Trainees have been hired by UOP since Riley's termination.

**F.    Riley's EEOC Charge and the Current Lawsuit**

On December 27, 2000, Riley filed a discrimination charge with the Equal Employment Opportunity Commission. She received a notice of her right to sue dated August 10, 2001, and she filed this lawsuit on November 1, 2001, within the required ninety days of receiving her right to sue letter. Count I of Riley's complaint alleges that she was discriminated against due to her race, in violation of 42 U.S.C. § 1981 ("section 1981"). Count II of her complaint is a claim for race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Count III of Riley's complaint contains a claim for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA").[4] Count IV of Riley's complaint alleges that she was discriminated against due to her sex, in violation of Title VII. Because all of Riley's claims arise under federal law, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. UOP now moves for summary judgment arguing that: (1) Riley cannot establish a prima facie case for discrimination; (2) UOP had legitimate, non-discriminatory reasons for firing Riley; and (3) Riley cannot prove that those reasons were pretextual.[5]

---

[4]Riley alleges a violation of the "Age Discrimination Act, 29 U.S.C. § 630 *et seq.*" The court assumes that she is referring to the ADEA, which prohibits age discrimination in employment and includes the statutory citation that Riley provides.

[5]Riley alleged a sex and age discrimination claim in her complaint. Additionally, she alleged that UOP discriminated against her with regard to her training, performance criteria, and performance scrutiny. However, Riley, in her response brief, failed to address issues raised by UOP with regard to those claims. Additionally, in her brief, Riley cited only her termination as an adverse employment action. Furthermore, in UOP's reply brief, Riley was put on notice that she had not addressed those issues and has not responded. Therefore, the court deems those issues abandoned and will proceed in its review of UOP's motion for summary judgment as to Riley's race discrimination claims only. *See Tucker v. Loyola Univ. of Chicago*, 192 F. Supp.
(continued...)

## II. DISCUSSION

### A. Motions *in Limine*

As a threshold matter, the court will dispose the parties' motions *in limine*. Riley seeks an order excluding UOP's after-acquired evidence. UOP seeks the following: (1) an order excluding evidence of discrimination against Dixon; (2) an order excluding statistical evidence offered by Riley; (3) an order excluding evidence relating to the performance of other UOP's employees after Riley's termination; and (4) an order excluding evidence of discrimination that occurred outside the applicable statutes of limitations. First, the court will address Riley's motion. Second, the court will discuss each of UOP's motions in turn.

#### 1. After-acquired evidence

Riley seeks the exclusion of UOP's after-acquired evidence regarding her work and education history. On January 23, 2003, the court granted plaintiff's motion to set schedule and set a discovery cut-off date of March 17, 2003 on the issue of the after-acquired evidence. On January 23, in open court, the parties agreed that discovery would be limited to the after-acquired evidence and defendant represented that the evidence was not relevant to the merits of its motion for summary judgment. Because, for reasons explained *infra* II.C., the court grants UOP's motion as to the merits of Riley's claims, without considering the after-acquired evidence, the court denies as moot Riley's motion *in limine*. The court vacates the March 17, 2003 discovery cut-off and the April 3, 2003 deadline for a supplement to the final pretrial order.

---

[5](...continued)
2d 826, 827 n.1 (N.D. Ill. 2002) (deeming waived plaintiff's age discrimination claim that was asserted in complaint but not addressed in response brief).

### 2. Evidence of discrimination against Dixon

UOP seeks the exclusion of evidence of discrimination against Dixon, who was one of Riley's supervisors. Dixon, like Riley, was an African-American who was terminated during the RIF. UOP correctly points out that Riley has not established that Dixon is similarly-situated to her. However, the Seventh Circuit has held that evidence of an employer's treatment of other members of the plaintiff's protected class can provide circumstantial direct evidence of discrimination. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Therefore, the court denies UOP's motion *in limine* regarding evidence of discrimination against Dixon.

### 3. Riley's Statistical Evidence

UOP seeks to exclude Riley's statistical evidence of racial discrimination in the RIF. Under *Troupe*, a plaintiff's statistical evidence of discrimination need not be "rigorously statistical." *Id.* As discussed below, *infra* Sect. II.C.1.d, even if the court considers this evidence, Riley's claims fail. Therefore, the court denies as moot UOP's motion *in limine* regarding Riley's statistical evidence.

### 4. Evidence of the performance of other UOP employees after Riley's termination

UOP seeks to exclude evidence of the performance of other UOP employees after the date of Riley's termination. Because Riley offers no such evidence, the court denies UOP's motion *in limine* as moot.

### 5. Evidence relating to time-barred claims

UOP seeks to exclude evidence concerning any discriminatory action by UOP that occurred outside the statutes of limitation governing her claims. For reasons already explained,

11

*supra* note 5, the court deems any such non-timely claims abandoned. Furthermore, even if the court considers evidence of potentially time-barred conduct by UOP, Riley's claims fail, for reasons discussed *infra* Sect. II.C. Therefore, the court denies as moot UOP's motion *in limine* regarding evidence of time-barred discriminatory conduct.

**B.**     **Summary Judgment Standard**

Summary judgment is appropriate only where "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1017 (7th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). A genuine issue of material fact exists when, viewing the record and drawing all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex,* 477 U.S. at 325 (noting also that "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case."). Once the moving party makes a prima facie showing that it is entitled to judgment as a matter of law, the non-moving party must set forth specific facts showing that a genuine issue for trial exists. *Id.* at 324; *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989). The non-moving party cannot rest on the

pleadings alone, but must designate *specific facts* in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

UOP argues that it is entitled to summary judgment in this case because Riley cannot establish a prima facie case for discrimination and because she cannot prove that UOP's stated reasons for terminating her employment were pretextual.

**C.      Riley's Race Discrimination Claim Regarding her Termination**

The court will now determine whether UOP discriminated against Riley on the basis of her race when it terminated her employment. Riley claims that UOP violated both Title VII and Section 1981 when it fired her.

Under Title VII, it is an unlawful employment practice for an employer "to discharge any individual ... because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). Similarly, Section 1981 proscribes discrimination based on race and ethnicity in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981 (a)-(b). Under both Title VII and Section 1981, a plaintiff can meet his burden of proof either by offering direct evidence of

13

discriminatory intent or through the indirect, burden-shifting method of proof articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 338 (7th Cir. 2002).

Riley argues that she has provided the court with direct evidence that UOP discriminated against her. First, the court will review this evidence. Second, if necessary, the court will determine whether Riley has provided indirect evidence of discrimination that allows her to succeed under the burden-shifting *McDonnell Douglas* standard.

### 1. <u>Direct evidence of discrimination</u>

Direct evidence is "'evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Cowan v. Glenbrook Sec. Serv. Inc.*, 123 F.3d 438, 443 (7th Cir. 1997) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)). Evidence qualifies as "direct" evidence when it "in and of itself suggests that the person or persons with the power to hire, fire, promote, and demote the plaintiff were animated by an illegal employment criterion." *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997). For a plaintiff to successfully establish direct evidence of discriminatory intent, it "essentially requires an admission by the decision maker that his actions were based on the prohibited animus," and these admissions are "rarely found." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000).

The Seventh Circuit has held that a plaintiff can build "direct" evidence from a mosaic of circumstantial evidence which may show that employer's decision was motivated by an impermissible purpose. *Troupe*, 20 F.3d at 736. *See also Pafford v. Herman*, 148 F.3d 658, 665

14

(7th Cir. 1998). Circumstantial evidence, if sufficiently persuasive, may defeat a motion for summary judgment on a Title VII claim. *Troupe*, 20 F.3d at 736. The "mosaic of discrimination" under *Troupe* can consist of many different kinds of evidence none conclusive in itself. However, a plaintiff must allege enough of them to satisfy this factor. *Bickerstaff v. Nordstrom, Inc.*, 48 F. Supp. 2d 790, 797 (N.D. Ill. 1999). In *Troupe*, the court stated that there are three types of circumstantial evidence upon which a plaintiff can rely in order to avoid the *McDonnell Douglas* burden-shifting method: (1) evidence consisting of suspicious timing, ambiguous statements, behavior directed toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, whether or not rigorously statistical, that similarly-situated employees who were not in the protected group received systematically better treatment; and (3) evidence that "the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 736.[6] In order to avoid summary judgment, Riley must produce evidence from which a

---

[6]As this court noted in *Demick v. City of Joliet*, 135 F. Supp. 2d 921, 933 n.5 (N.D. Ill. 2001) and *Haywood v. Lucent Technologies*, 169 F. Supp. 2d 890, 909 n.5 (N.D. Ill. 2001), several courts have limited or criticized *Troupe*'s expansive definition of circumstantial evidence. *See Cowan*, 123 F.3d at 443-44 (holding that direct evidence cannot rely on inference or presumption but must directly prove that an employer's actions were motivated by racial animus – although not citing *Troupe*); *Schaffner v. Rush Presbyterian St. Luke's Hosp.*, No. 94 C 2471, 1996 WL 507246, at *5 n.8 (N.D. Ill. Sept. 4, 1996) (finding that, because the definition of circumstantial evidence improperly incorporates the indirect method and because the court did not believe the Seventh Circuit intended to eliminate the indirect method under *McDonnell Douglas*, the third type of circumstantial evidence should be analyzed under the burden-shifting (continued...)

rational trier of fact could reasonably infer that UOP made the decision to terminate her because of her race. *Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998). Riley argues that she has presented evidence in each of the *Troupe* categories.

### a.   Ambiguous statements

Riley points to one comment that, she argues, constitutes evidence of a discriminatory motive in the decision to terminate her employment.[7] Particularly, Riley argues, "Armstrong called Riley and another black operator a 'monkey' while complaining that they were only able to do 'monkey-see-monkey-do' skills." (Pl's Resp. at 7.) Riley claims that this comment clearly

---

[6](...continued)

method). *See also Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (finding that whether "the evidence presented is characterized as 'indirect' evidence or 'mosaic' evidence, very often the best way to evaluate the plaintiff's case at the summary judgment stage is 'to use the *McDonnell Douglas* steps'..."); *Huff v. UARCO*, 122 F.3d 374, 380 (7th Cir. 1997) (holding that the standard of proving pretext is the same under *Troupe* and *McDonnell Douglas*); *Jones v. City of Elgin*, No. 96 C 6920, 1998 WL 259538, at *7-8 (N.D. Ill. May 13, 1998) (adopting the reasoning of *Schaffner* and analyzing plaintiff's evidence under *McDonnell Douglas*). This court agrees with the holdings in *Huff* and *Schaffner* that circumstantial evidence regarding the pretextual nature of an employer's reasoning is more appropriately analyzed under *McDonnell Douglas*. Further, this court also notes that the idea of using circumstantial evidence – which by its very nature requires a finder-of-fact to make inferences and presumptions – to directly establish discrimination seems oxymoronic. However, other recent Seventh Circuit cases have upheld *Troupe* and applied that standard. *See Bell v. EPA*, 232 F.3d 546, 553-54 (7th Cir. 2000) (applying the *Troupe* standard and considering circumstantial evidence); *Council 31, Am. Fed'n of State, County & Mun. Employees v. Doherty*, 169 F.3d 1068, 1072-73 (7th Cir. 1999); *Pafford*, 148 F.3d at 665. Thus, despite the inconsistencies and confusion among the courts, this court must accept the standard set forth in *Troupe* as good law.

[7]Riley also cited an incident in which Beck, in response to Dixon expressing his concern about being fired due to a drop in his performance ratings, said, "Oh, don't worry about it. You're covered by that age thing." (Dixon Dep. at 40.) The court has already found, *supra* note 5, that Riley has abandoned her age discrimination claims. Therefore, the court concludes that this statement by Beck provides no evidence of UOP's racial discrimination against Riley, as it is totally unrelated to Riley, her remaining race discrimination claim against UOP, or a racially discriminatory motive by UOP or any of its employees.

evidences racially discriminatory animus by Armstrong that should be imputed to Beck because Armstrong was influencing Beck's decision regarding Riley's job performance.

Ambiguous statements, for purposes of proving discrimination by direct circumstantial evidence refer to "isolated comments" supporting an inference of discrimination that were made contemporaneously with the adverse employment decision. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). The Seventh Circuit has stated that bigotry is actionable "only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Id.* (citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000)). Such comments constitute direct evidence of discrimination only if "the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Id.* (citing *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000)).

First, the court notes that there is no evidence to support Riley's contention that Armstrong called her or any other UOP employee a "monkey." Armstrong, in the email in question, was informing Beck of Riley's difficulty in understanding the operation of Plant 26. The email was dated April 19, 1999, which was slightly over six months after Riley began working at UOP and more than a year before she was fired. Armstrong, describing Riley's apparent difficulty in learning the operation of the plant, wrote, "[Riley] is limited as far as her learn skills are going. It's more of a monkey see monkey do training. It needs to be repetitions for them to do the job (but with it comes lack of understanding). We in the S.S. office are going to have to cont. on the job training or make a decision on there [sic] future." (Beck Dep. Ex. 24.)

The court finds that Armstrong's email regarding Riley does not evidence a racially discriminatory motive behind the decision to terminate her employment. First, the comment was made by Armstrong, who merely trained Riley, and not by Beck, who actually made the decision to terminate her. The Seventh Circuit has held that the prejudices of a decision-maker's subordinate employee can be imputed to the decision-maker only when the subordinate is concealing relevant information from the decision-maker or feeding false information to the decision-maker. *Wallace v. SMC Pneumatics*, 103 F.3d 1394, 1400 (7th Cir. 1997). In this case, Armstrong's statements regarding Riley's difficulties with plant operations at that point in her training are corroborated by the testimony of Brodin and Dixon. Consequently, the undisputed evidence in this case demonstrates that Armstrong was not providing Beck with false information regarding Riley's performance. Therefore, the court cannot impute any discriminatory animus that could be evidenced from Armstrong's email to Beck, and, consequently, cannot draw a connection between that email and Beck's decision to terminate Riley more than one year later, during the RIF. Accordingly, the court concludes that Armstrong's potentially discriminating motive for making the comment cannot be connected to the decision to terminate Riley.

Therefore, the court finds that Riley has failed to bring to the court's attention any ambiguous comments that provide direct evidence of a racially discriminatory animus in the decision to terminate her employment.

### b. Behavior towards other group members

Riley argues that UOP's treatment of Dixon, who is also African-American, evidences the company's racially discriminatory attitudes. Particularly, Riley raises the following

arguments: (1) Dixon was not promoted to area coach; (2) Beck held Dixon accountable for her hiring; (3) the fact that Beck was suspicious of her and Dixon because they knew each other before she began to work at UOP but that Beck was not suspicious of two Caucasian UOP employees who were involved in a romantic relationship; (4) another African-American operator had his ratings lowered by Beck while under Dixon's supervision; and (5) UOP discriminated against Riley because Dixon filed a discrimination claim with the EEOC. The court will review each of Riley's arguments in turn.

First, Riley's argument regarding Dixon not receiving the promotion does not provide evidence of racial discrimination. The mere fact that Dixon was not promoted to area coach does not support a conclusion that Caucasian employees were favored for promotion over Dixon, due to discriminatory practices by UOP. Because Riley provides no additional evidence of discrimination with regard to Dixon not being promoted the court is unpersuaded by her argument on this point.

Second, Beck named Dixon to lead the hiring team. That Beck gave additional responsibility to an African-American employee, particularly responsibility in the hiring process, cannot support a conclusion that Beck was discriminating against African-American employees. Furthermore, because Dixon was the leader of the hiring team, it was perfectly logical for Beck to hold him responsible for Riley's hiring.

Third, when Beck learned that Riley and Dixon knew each other prior to Riley being hired, he became concerned that their acquaintance had influenced Dixon's decision on the hiring team, as well as his evaluations of her. Riley argues that, in contrast, Beck had no

suspicions toward two Caucasian employees who were engaged in a romantic relationship. The undisputed evidence indicates, however, that Beck was unaware of the relationship between the two Caucasian employees. Additionally, Beck testified that he would have been concerned, had he been aware of the relationship. (Beck Dep. at 204-05.) Therefore, the court finds this argument unpersuasive.

Fourth, Riley argues that UOP's discriminatory attitude is evidenced by the fact that another African-American operator, Calvin Jones ("Jones") had his performance ratings lowered while under Dixon's supervision. Dixon testified that he felt that the African-American operators whom he supervised had received ratings lower than he thought they should have received. However, this evidence does not provide evidence of a discriminatory animus by UOP. The undisputed evidence in the record is that Beck was involved in determining the performance ratings of Riley and other operators. Riley's evidence merely establishes that African-American operators were affected by Beck's practice. Her evidence does not, however, establish that African-Americans were affected differently than other operators with other supervisors and, therefore, is not probative of a discriminatory motive by UOP.

Finally, Riley argues that it is a fair inference that she was the target of reflected retaliation from Beck's retaliation against Dixon for filing a discrimination charge with the EEOC. Riley claims that retaliation against a fellow class member can give rise to an inference of discriminatory animus. In support of her argument, Riley cites to *Wu v. Thomas*, 863 F.2d 1543 (11th Cir. 1989), as an example of a case in which courts have recognized third party retaliation as the basis for a retaliation claim. However, Riley has not asserted a retaliation claim

and, therefore, *Wu* is inapplicable to this case. Riley has cited to no authority – nor has the court's own research revealed any – to support a conclusion that retaliation against a member of the plaintiff's protected class can provide evidence of a discriminatory animus towards the plaintiff. Furthermore, Riley has failed to provide any evidence or argument – beyond her own speculation of what constitutes a "fair inference" – to connect UOP's allegedly retaliatory action against Dixon to the decision to terminate her employment. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 736 (7th Cir. 2001) (stating that direct evidence requires a showing of some link between the alleged prejudice and the challenged employment decision).

### c. Suspicious timing

Riley argues that she has two pieces of evidence of suspicious timing. First, she points to the fact that Beck, when making the decision to fire Riley, did not consider current information about her performance, even though he sought current information regarding other trainees. Second, Riley contends that the fact that UOP hired new operator trainees in the summer of 2000, despite its knowledge of a financial downturn and anticipation of a RIF evidences suspicious timing.

Suspicious timing, in the context of a *Troupe* analysis refers to instances where an employee is discharged soon after his membership in a protected group becomes an issue. *Bickerstaff*, 48 F. Supp. 2d at 797 (citing *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1034 (7th Cir. 1999); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir. 1998)). Riley has provided no authority – nor has the court's own research revealed any – that conducts a suspicious timing analysis in a racial discrimination case. The other cases in this circuit that

apply a suspicious timing analysis have done so in the context of retaliation cases, as well as discrimination claims based upon disability or pregnancy. *See Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1136 (7th Cir. 1997) (considering evidence of suspicious timing in case under the Americans with Disabilities Act); *Karczynski v. Specialty Equip. Mfg., Inc.*, 105 F. Supp. 2d 907, 912 (N.D. Ill. 2000) (considering plaintiff's evidence of suspicious timing in case under Pregnancy Discrimination Act); *Bernales v. Cook County*, 139 F. Supp. 2d 927, 940 (N.D. Ill. 2001) (considering suspicious timing evidence in reference to plaintiff's retaliation claim). In all these cases, the courts' analyses turned upon the proximity in time between the adverse employment action and the plaintiff's entering the protected group -- by becoming pregnant, developing a disability, or engaging in protected conduct. In this case, Riley offers no argument or evidence that there was suspicious timing between her membership in a protected class and her termination. Therefore, the court is unpersuaded by her arguments on this point.

Even if Riley's evidence were appropriate evidence of suspicious timing, the court finds that the evidence is not probative of racial discrimination. She appears to be arguing that Beck favored newly-hired operators at her expense and that Beck had already decided to fire her before the RIF was even announced. However, she does not argue that these alleged actions by Beck occurred at her expense and to the benefit of non-African-American operators. Therefore, this evidence does not provide circumstantial proof of racial discrimination. Nevertheless, Riley's arguments and evidence may be relevant to the issue of pretext, which the court will discuss below, *infra* Sect. II.C.1.f.

### d.  Statistics

Riley argues that she has presented statistical evidence to establish that Beck's selection

of employees for the RIF was motivated by racial discrimination against African-Americans.

Particularly, she points to the fact that two of the three employees terminated in the RIF were

African-American, but that only approximately fifteen percent of the workforce for which Beck

was responsible was African-American.

Although statistics can be used to prove discriminatory intent, they, like any evidence,

are not irrefutable. *Allen v. Bake-Line Prods., Inc.*, No. 98 C 1119, 2001 WL 1249054, at *4

(N.D. Ill. Oct. 18, 2001) (citing *EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d

872, 876 (7th Cir. 1994)).  A basic problem with statistics is that they "can only show a

relationship between an employer's decision and the affected employees' traits; they do not show

causation." *Radue*, 219 F.3d at 616.  Statistical evidence that fails to properly account for

nondiscriminatory explanations does not permit an inference of discrimination. *Id.* at 616-17.

A plaintiff must show disparate treatment of comparable individuals. *Id.* at 617 (citation

omitted).  With this standard in mind, the court now turns to Riley's statistical evidence.

First of all, Riley has provided no evidence to support her claim that fifteen percent of

the workforce at the time of the RIF was African-American.  In making this claim, Riley relies

upon Beck's deposition testimony regarding an organization chart for the operations group that

predated Riley's employment at UOP.  Beck's undisputed testimony is that he supervised

approximately forty-eight employees when he began working at the McCook facility and that

number of employees declined to between thirty-five and forty.  (Beck Dep. at 14.)  Riley

provides no evidence of the number of African-American employees under Beck's supervision at the time of the RIF. Therefore, the court cannot determine what percentage of the employees under Beck's supervision were African-American at the time of the RIF.

Even assuming that Riley did provide evidence to support her claim that fifteen percent of the workforce at the time of the RIF was African-American, the court would still be unpersuaded by her argument. When a sample group of employees is very small, the possibility that the disparity is merely due to chance rises significantly. *Jones v. Provena Saint Joseph Med. Ctr.*, No. 98 C 5058, 2000 WL 378528, at *7 (N.D. Ill. Jan. 7, 2000) (citing *Parker v. Fed. Nat'l Mortgage Ass'n*, 741 F.2d 975, 980 (7th Cir. 1984)). Therefore, disparities taken from small samples are insufficient to support an inference of discrimination. *Id.* (citing cases). In this case, only three employees were terminated in the RIF. That sample is too small to allow any meaningful statistical analysis of whether a disproportionate number of African-American employees were terminated. Consequently, the court finds that evidence to be insufficient to allow it to reach a conclusion that African-American employees were systematically discriminated against in the RIF. *See id.* (granting employer's motion for summary judgment where plaintiff's statistical evidence was insufficient).

Therefore, the court is unpersuaded by Riley's statistical evidence of racial discrimination by UOP.

### e. Treatment of similarly-situated employees

Riley seeks to provide circumstantial evidence of racial discrimination by arguing that similarly-situated employees were treated more favorably than she was. UOP, however,

contends that she has not established that any employee in UOP's workforce was similarly-situated to her.

The standard for determining whether employees are similarly-situated to a discrimination plaintiff under a *Troupe* analysis is identical to the standard used when reviewing a claim under *McDonnell Douglas*. *See Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (holding, in *Troupe* case, that similarly-situated employees must be similarly-situated in all respects); *Ibarra v. Martin*, 143 F.3d 286, 293 (7th Cir. 1998) (holding that where plaintiff failed to prove similarly-situated employees under *Troupe* analysis, plaintiff could not establish a prima facie case for discrimination under *McDonnell Douglas*). A discrimination plaintiff must show that other, similarly-situated employees who were not members of her protected class were treated more favorably. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). In determining whether two employees are similarly-situated, a court must look at all relevant factors, the number of which depends on the context of the case. *Radue*, 219 F.3d at 617. At a minimum, a plaintiff in a RIF case must show that the retained employees possessed analogous attributes, experience, education, and qualifications relevant to the positions sought. *Id.* at 618 (citing cases).

First, Riley argues that, because Beck testified that he had theoretically considered the entire workforce under his supervision for the RIF, all those employees are similarly-situated to her. However, Riley offers no argument or evidence that any of those employees possess similar attributes, experience, and education to her. Therefore, the court is unpersuaded by this argument.

Second, Riley argues that she was similarly-situated to the other employees with her job classification. Riley refers to UOP's mention of a group of employees in its memorandum in support of its motion for summary judgment, and appears to be arguing that she is similarly-situated to the five other operator trainees in the IGP program at the time of the RIF. However, relevant to this inquiry is only whether Riley was similarly-situated to other employees who were not in her protected class. *Bellaver*, 200 F.3d at 494. Only one of the other operator trainees in UOP's IGP program at the time of the RIF was not African-American – Gardner, who was Native American.[8] Riley offers no evidence or argument that she and Gardner shared substantially similar attributes, experience, or education. Therefore, the court finds that Riley has failed to meet her burden of establishing that Gardner was similarly-situated to her. Furthermore, Riley admits that Gardner had not been subject to UOP disciplinary action at the time of Riley's termination. In contrast, Riley had received two written warnings and a suspension. Therefore, the court finds that Riley and Gardner are not similarly-situated. *See Radue*, 219 F.3d at 618-19 (holding that employee with clean performance record was not similarly-situated to plaintiff who had substantial performance problems).

---

[8]Riley, in her Local Rule 56.1(b)(3) statement, denies that Gardner is Native American. However, she offers no evidence in support of her contention. Therefore, she has failed to properly respond to that paragraph of UOP's Local Rule 56.1(a)(3) statement. Additionally, Mark Hernandez ("Hernandez") was also mentioned in the portions of the record that Riley cites in support of her arguments regarding similarly-situated employees. However, Hernandez was fired before the RIF occurred and, therefore, is not relevant to this analysis. Even if Hernandez were relevant, Riley has provided no evidence to support a conclusion that she and Hernandez were similarly-situated.

Third, Riley argues that she was similarly-situated to Hristinski, who is Caucasian, because Beck actually compared her to Hristinski when deciding whom he should terminate. However, the mere fact that Beck actually compared Riley and Hristinski does not render them similarly-situated. *See Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (noting that a discrimination plaintiff has the burden of proving that employees were similarly-situated to her). Riley points to the fact that Beck chose to terminate her but retained Hristinski, even though both employees had ratings of "M-" on their most recent written performance evaluations. She claims that Beck made his decision based upon his assumption that Hristinski was a better learner. Additionally, however, Beck testified that he made his decision based upon his recollection that Hristinski had higher performance ratings and a cleaner record of work discipline than Riley over the previous two or three years. As already noted, Riley had received overall scores of "M+" and "M-" on her two prior IGP evaluations. Additionally, she had received two written warnings and a suspension from UOP. Riley provides no evidence of Hristinski's performance ratings or disciplinary records for the two years preceding the RIF. Nor does she provide evidence of Hristinski's experience, education, or qualifications. Therefore, Riley has failed to meet her burden to establish that Hristinski was similarly-situated to her.

Therefore, the court concludes that Riley has failed to provide any evidence regarding UOP's treatment of similarly-situated employees that constitutes circumstantial direct evidence of discrimination.

### f. Pretext

Riley claims that she has submitted evidence that UOP's explanation that she was terminated as part of a RIF was pretextual. She makes two arguments in support of this position.

First, she argues that UOP's RIF was merely a pretext for terminating her employment. Second, she argues that UOP's reasons for including her in the RIF were pretextual.

In reviewing a case under *Troupe*, a court applies the same standard for proving pretext that it applies under the *McDonnell Douglas* analysis. *O'Regan v. Arb. Forums, Inc.*, No. 95 C 6464, 1999 WL 731775, at \*9 (N.D. Ill. Aug. 30, 1999) (citing *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997)). In order to show that a defendant's articulated nondiscriminatory explanation for the adverse employment action was pretextual, a plaintiff must "*specifically refute the facts which allegedly support the employer's proffered reasons.*" *Mills v. First Fed. Sav & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citation omitted) (emphasis in original). Furthermore, she "must show more than that the employer's decision was incorrect; [Riley] must also show the employer lied about its proffered explanation." *Johnson*, 260 F.3d at 732 (internal quotations omitted). *See also Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001) ("[W]hen reviewing a grant of summary judgment, the only question before us is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies."); *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("The mere fact that the employer acted incorrectly or undesirably ... cannot adequately demonstrate pretext."). In a RIF case, a plaintiff can show pretext either by establishing that the RIF itself was pretextual or by showing that the employer's reasons for including her in the RIF were pretextual. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1014 (7th Cir. 2000).

### i.     The RIF

First, Riley argues that UOP's RIF was merely a pretext for terminating her employment. In support of her position, Riley argues that UOP continued to hire new employees, even after the company began to anticipate a financial downturn and Beck began to anticipate a RIF. She appears to be taking issue with the hiring of Jones, in June 2000 and Willis and Mark Hernandez in August 2000. It is true that "[e]vidence that an employer continued hiring during a purported RIF may suggest that the RIF was pretextual." *Id.* However, the undisputed evidence in this case is that Arneson informed Beck of the RIF in early October 2000, at the earliest. Therefore, Jones, Willis, and Hernandez were hired before the RIF took place, and Riley offers no evidence of any employee hired by UOP after the RIF began. Riley has provided no authority -- nor has the court's own research revealed any -- to support a conclusion that a plaintiff may show that a RIF was pretextual with evidence that a company continued to hire employees prior to the RIF, but in the face of financial difficulties. Courts in the Seventh Circuit consistently have emphasized that they will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. N.E. Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). Additionally, of the three employees that were hired in the summer of 2000, two -- Jones and Willis -- were African-American. Therefore, the court cannot conclude that the hiring of Jones, Willis, and Hernandez constitutes circumstantial evidence of discrimination against Riley on the basis of race.

Riley appears to be arguing that the RIF was contrived in order to create an excuse to fire her. However, she admits that Arneson told Beck to select employees to be eliminated and does

not argue that Beck had any part in initiating the process of reducing the workforce at the McCook facility. Additionally, she makes no argument regarding any discriminatory motive on Arneson's part. Because this argument by Riley is not supported by the undisputed facts in this case, the court does not find it persuasive.

Additionally, Riley argues that she was the only one fired in the RIF. In support of her argument, Riley points to the fact that Dixon and Caufield – the other two employees terminated at the same time as Riley – were told that they were being fired due to their performance. However, this is consistent with the undisputed evidence that Beck was directed to select employees to be terminated in the RIF based upon performance. Furthermore, Beck testified, when describing the separation meetings with Riley, Dixon, and Caufield, that he had followed a UOP script designed for such meetings. That script includes language describing a RIF. Therefore, the court is unpersuaded by Riley's arguments that the RIF was pretextual.

### ii.    Riley's inclusion in the RIF

Riley appears to raise two arguments that UOP's reasons for including her in the RIF were pretextual. Particularly, she argues: (1) Beck did not consider the cost-effectiveness of terminating Riley, as opposed to other employees and (2) Beck sought performance information regarding the newly-hired operators but did not review current information regarding Riley's performance. The court will address each of Riley's arguments in turn.

As the court has already stated, a court reviewing a discrimination case will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs,* 153 F.3d at 396. Riley seems to be asking the court to do precisely that when she argues that Beck failed

to analyze the potential savings of terminating other employees, instead of her. Furthermore, she offers no evidence either that Beck did, in fact, fail to consider the cost-effectiveness of his decision. Therefore, the court is unpersuaded by this argument.

Now the court turns its attention to Beck's consideration of current information regarding Riley's performance at the time of the RIF. In evaluating whether Beck's stated reasons for discharging Riley are pretextual, the court must consider whether he honestly believed those reasons at the time he made the decision. *Paluck*, 221 F.3d at 1015 (citing *Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999) (finding that district court cannot consider evidence that "had no bearing on management's state of mind at the time the decision to terminate [the plaintiff] was made.")) Riley must establish that Beck's reasons either: (1) had no basis in fact; (2) did not actually motivate her termination; or (3) were insufficient to motivate her termination. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002).

Riley contends that Beck refused to consider up-to-date information about Riley's performance and that Beck admitted to seeking out up-to-date information about newly-hired operators – Riley appears to be referring to Jones – who had not yet had a performance review. However, Riley's factual assertions are not supported by her citations to the record. First, the excerpt of Beck's deposition to which Riley cites does not support her statement that Beck sought up-to-date information at the time of the RIF. Instead, Beck merely stated that it was his practice regarding new hires to ask shift break operators how the training was going. (Beck Dep. at 258.) Second, Riley cites to no portion of the record that establishes that Beck "refused to consider" information about her. There appears to be a dispute between the parties about

31

whether Beck had possession of Riley's November 2000 IGP evaluation at the time he made the decisions regarding the RIF, although it is undisputed that he did not consider it when he made his decision to fire Riley. Therefore, the draft November 2000 IGP evaluation and the Personal Improvement Plans are not probative of pretext. *See Cullen*, 195 F.3d at 324 (stating that district court may consider only evidence that decision-maker considered in determining whether stated reasons were pretextual).

Even if Beck did have possession of Riley's November 2000 evaluation, and ignored it while considering who to terminate in the RIF, Riley has offered no evidence that the evaluation and the improvement that it reflected would have influenced Beck's decision. The undisputed evidence establishes that Riley had a series of performance problems during her twenty-four month tenure at UOP, as well as a disciplinary record including two written warnings and a suspension. Beck stated that he selected Riley for the RIF, based upon her performance record and disciplinary history.[9] At most, Riley's November 2000 evaluation could show that Beck's assessment of Riley's current performance was erroneous. However, in order to show pretext, it is not enough for Riley to merely show that Beck's decision was erroneous – she must show that he was lying. *Johnson*, 260 F.3d at 732. Therefore, the court finds that Riley has failed to establish that Beck's stated reasons for her termination have no basis in fact, that they did not actually motivate her termination, or that they were insufficient to motivate her termination.

---

[9]Riley argues that a jury could conclude that a negative performance evaluation was a fabricated attempt to justify a plaintiff's termination. However, she does not point to any of her IGP evaluations as being fabricated and offers no evidence to contradict her performance history or her disciplinary record. Therefore, the court cannot find that any of Riley's performance evaluations were fabricated.

Accordingly, the court concludes that Riley has failed to establish that her inclusion in the RIF was pretextual. Thus, the court finds that Riley has provided no evidence to support a reasonable inference that UOP's stated reasons for her termination were pretextual, under *Troupe*.

In sum, the court finds that Riley has failed to create a mosaic of circumstantial evidence that would allow a rational trier of fact to reasonably infer that UOP made the decision to terminate her because of her race. The only potentially probative evidence of discrimination that Riley offers is her statistical evidence. In addition to the problems with that evidence that the court has already noted, *supra* Sect. II.C.1.d., courts have held consistently that statistical evidence alone is insufficient to support a claim for discrimination. *Radue*, 219 F.3d at 616. Therefore, the court will review Riley's claims under the *McDonnell-Douglas* burden-shifting method.

## 2.  Indirect evidence of discrimination

Under *McDonnell Douglas*, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case, then "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets its burden, then the plaintiff must show, by a preponderance of the evidence, that the employer's stated reason for her dismissal is nothing more than pretext. *Id.*

### a.  Riley's prima facie case

A prima facie case of racial discrimination under Section 1981 is based upon the same elements as a race discrimination claim under Title VII. *Lalvani v. Cook County, Ill.*, 269 F.3d

785, 788 (7th Cir. 2001). To establish a prima facie case of employment discrimination, Riley must show that: (1) she belongs to a protected group; (2) she performed her job satisfactorily; (3) her employer subjected her to an adverse employment action; and (4) similarly-situated employees outside her classification received more favorable treatment. *Grayson*, 308 F.3d at 817-18. The parties do not dispute that Riley, an African-American, is a member of a protected group or that UOP terminating her employment constituted an adverse employment action. However, the parties disagree as to whether Riley can establish elements two and four of her prima facie case.[10]

The court has already determined *supra* Sect. II.C.1.e. that Riley has failed to prove that any other non-African-American UOP employee was similarly-situated to her. Therefore, the court finds that Riley cannot meet her burden of establishing a prima facie case for discrimination under *McDonnell Douglas*. *See Ibarra*, 143 F.3d 293 (holding that plaintiff who failed to prove other employees were similarly-situated under *Troupe* could not establish a prima facie case under *McDonnell Douglas*.) Consequently, the court need not address whether Riley's performance was satisfactory. Accordingly, the court grants UOP's motion for summary judgment as to Riley's race discrimination claim.

### b. Legitimate nondiscriminatory reasons

If Riley could establish a prima facie case for race discrimination, the burden under *McDonnell Douglas* would shift to UOP to articulate legitimate nondiscriminatory reasons for

---

[10]UOP contends that the fourth element of a prima facie case for race discrimination under Title VII requires a plaintiff to show that the employer sought a replacement for her. Regardless of which statement of the prima facie case the court applies, Riley's claims fail.

terminating her employment. *Grayson*, 308 F.3d at 818. In this case, UOP has stated that Riley was discharged as part of the RIF and that she was selected for the RIF based upon her performance and her disciplinary record. Therefore, the court concludes that UOP has met its burden under *McDonnell Douglas*.

### c. Pretext

Because UOP has articulated a legitimate, nondiscriminatory reason for its decision to terminate Riley's employment, Riley must show the proffered reason to be pretextual. *Grayson*, 308 F.3d at 818. As the court has already noted, the standard of proving pretext under the *McDonnell Douglas* analysis is the same as that applied to circumstantial direct evidence cases under *Troupe*. *O'Regan*, 1999 WL 731775, at *9. The court has already found, *supra* Sect. II.B.1.f, that Riley has failed to establish both that the RIF and her inclusion in it were pretextual. Therefore, she has failed to meet her burden under *McDonnell Douglas*, as well. Accordingly, the court grants UOP's motion for summary judgment on this point.

Thus, the court grants UOP's motion for summary judgment as to Riley's claims for race discrimination under Title VII and section 1981.

### III. CONCLUSION

For the foregoing reasons, the court (1) denies as moot plaintiff's motion *in limine*; (2) denies defendant's motions *in limine* and (3) grants defendant's motion for summary judgment. Final judgment in this case is entered in favor of defendant UOP LLC and against plaintiff Shirley Riley.

Date: **FEB 1 3 2003**

James H. Alesia
United States District Judge

35